## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

_____

| | |
|---|---|
| SHANE GRECKEL | ) COMPLAINT |
| | ) AND DEMAND FOR JURY |
| Plaintiff, | ) TRIAL |
| | ) |
| v. | ) |
| | ) Case No: |
| MONSANTO COMPANY, BASF CORPORATION, | ) |
| BASF SE, E.I. DUPONT DE NEMOURS AND | ) |
| COMPANY, and PIONEER HI-BRED | ) |
| INTERNATIONAL INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

_____

## COMPLAINT

Plaintiff Shane Greckel, complaining against Defendants, Monsanto Company ("Monsanto"); BASF Corporation and BASF SE (together, "BASF"); and E.I. duPont De Nemours and Company and Pioneer Hi-Bred International, Inc. (together, "Dupont") states as follows:

## NATURE OF THE CASE

1.     This case involves the auxin herbicide dicamba, which is manufactured, sold, distributed and promoted under the brand names Xtendimax, Engenia, and Fexapan by Defendants Monsanto, BASF, and DuPont, respectively.

2.     Defendants misrepresented that their formulations of dicamba—Xtendimax, Engeina, and Fexapan—could be used safely without causing harm to others through off target movement.

3.     Dicamba is a highly volatile herbicide that was discovered in 1958 by BASF, and marketed under various trade names including Banvel, Marksman, and Clarity.

1

4.      Due to its volatility, propensity to move off target, and ability to cause serious injury to non-target plants, dicamba was only used as a pre-planting or post-harvest burndown herbicide prior to November 2016, and was not approved to be used for in-crop or over the top crop applications. To move off target means that the active ingredient in dicamba moves from its intended location to a location(s) where the crops are not genetically modified to be resistant to the active ingredients in dicamba.

5.      Since introduction of genetically modified seeds designed to be resistant to the active ingredient in Roundup in 1996, over-reliance on Monsanto's Roundup as a primary weed control herbicide created an environment in which Roundup resistant weeds flourished and proliferated across the United States.

6.      To retain its stranglehold on the seed and herbicide markets despite the decreasing efficacy of Roundup, and the impending loss of its patent protections for Roundup Ready seeds, Monsanto created new strains of soybean and cotton that were resistant to dicamba—an older, more toxic, and more uncontrollable herbicide. Monsanto branded these dicamba resistant crops as Xtend varieties.

7.      Monsanto thereafter collaborated with BASF & DuPont to develop new formulations of dicamba that could be marketed for in-crop uses and over the top crop applications on Xtend soybeans and cotton.

8.      Defendants marketed these formulations as revolutionary break-throughs that minimized volatility, and could be used safely without risk of causing harm to non-Xtend crops.

9.      In actuality, Xtendimax, Engenia, and Fexapan are not appreciably less volatile than prior formulations of dicamba, and have caused serious harm to crops throughout the United States.

2

10.     Defendants sold these formulations of dicamba despite knowing that severe and widespread injuries would result, because Defendants understood that such injuries would force farmers to defensively plant Xtend crops in future growing seasons and thereby increase the market for Xtendimax, Engenia, and Fexapan and Monsanto's Xtend soybean and cotton seeds.

11.     As a result of Defendants' greed, recklessness, and callous disregard of the rights of American farmers, thousands of farmers' livelihoods have been jeopardized, and millions of acres of crops have been destroyed.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, inter alia, a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in, and because the Defendants transact business in, this district.

## PARTIES

14.     Plaintiff Shane Greckel is a farmer residing and doing business in Bloomfield, NE.

15.     Defendant Monsanto Company is a corporation organized and existing under the laws of the State of Delaware and maintains its principle place of business at 800 North Lindbergh Blvd., St. Louis, Missouri 63167.

16.     Defendant BASF Corporation is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF Corporation is the affiliate, subsidiary, distributor, and North American agent for Defendant BASF SE, a German company.

3

17.     Defendant E.I. duPont de Nemours and Company is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805

18.     Defendant Pioneer Hi-Bred International, Inc., d/b/a Dupont Pioneer, is a corporation organized under the laws of the State of Iowa and maintains its principal place of business at 7000 NW 62nd Avenue, Johnston, Iowa 50131. Pioneer Hi-Bred International, Inc.. is an affiliate, subsidiary, distributor, and agent of Defendant E.I. duPont de Nemours and Company.

19.      In 2005, Monsanto began engineering and developing crops that were resistant to dicamba, and would be branded as Xtend varieties. Dicamba resistant Xtend Cotton and Soybeans are manufactured and marketed by Monsanto.

20.     In January 2009, Monsanto entered into a joint licensing agreement with BASF, the inventor of dicamba and manufacturer of several dicamba products, to jointly develop and test new formulations of dicamba for use in dicamba resistant Xtend crops.

21.     BASF and Monsanto entered into an additional agreement in March 2011 in which the companies granted each other reciprocal licenses, and BASF agreed to supply formulated dicamba herbicide products to Monsanto.

22.     The dicamba formulations Xtendimax, which would be marketed and sold by Monsanto, and Engenia, which would be marketed and sold by BASF, were developed through and are manufactured pursuant to the agreements referenced in paragraphs 20 and 21 above, between Monsanto and BASF.

23.     In March 2013, Monsanto entered into a licensing agreement with Dupont and its subsidiary Pioneer Hi-Bred International, Inc. to allow for the use and sale of dicamba resistant Xtend soybeans.

4

24.     In June 2016, Monsanto entered into a multi-year agreement to supply Dupont with dicamba formulations developed and manufactured pursuant to Monsanto's joint licensing agreement with BASF. The dicamba supplied to Dupont by Monsanto through the agreement referenced in paragraph 23 above, is sold by Dupont as Fexapan.

25.     At all relevant times, Monsanto, BASF, and Dupont, were engaged in the business of researching, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and advertising for sale or selling Xtendimax, Engenia, and Fexapan for use by farmers.

26.     At all relevant times, Monsanto and BASF manufactured Xtendimax, Engenia, and Fexapan.

27.     At all relevant times, Monsanto sold, distributed and promoted Xtendimax, and seed for Xtend varieties of cotton and soybeans.

28.     At all relevant times, BASF sold, distributed and promoted Engenia.

29.     At all relevant times, Dupont sold, distributed and promoted Fexapan, and seed for Xtend varieties of soybeans.

## FACTUAL ALLEGATIONS

30.     Dicamba (3,6-dichloro-o-anisic acid) is a non-selective auxin herbicide that mimics plant growth hormones; it is highly toxic and highly mobile.

31.     Dicamba was first marketed for commercial applications by BASF in 1964, under the name Banvel. BASF introduced several other dicamba brands throughout the years, including Marksman in 1986 and Clarity in 1992.

32.     Dicamba, including the brands mentioned above, has traditionally been used for control of annual, simple perennial, and creeping perennial broadleaves in non-crop situations,

such as pre-planting and post-harvest burndown applications, and in grass crops such as corn, small grains, sorhum, turf, pastures, sodded roadsides, and rangeland.

33.     Injury to off-target vegetation is a major problem associated with dicamba, and until recently, dicamba was not approved or used for in crop applications, or over the top crop spraying, due to its high volatility.

34.     Volatility, also known as vapor drift, refers to the ability of an herbicide to vaporize and mix freely with air. This occurs when an herbicide changes from a solid or liquid into a gaseous state and moves off the target area.

35.     When a volatile herbicide vaporizes, the herbicide vapor can travel long distances over long periods of time, and cause damage to non-target plants several miles away over the span of many days.

36.     Volatility is a characteristic of the formulation of an herbicide and its active ingredient—not all herbicides are sufficiently volatile to cause plant injury from vapor drift.

37.     Certain conditions, such as temperature, humidity, and mixture with additional herbicides can exacerbate the volatility of any given herbicide.

38.     Specifically, the volatility of dicamba greatly increases in high temperatures, low humidity, or when it is mixed with Roundup or glyphosate.

39.     Glyphosate is a non-volatile EPSP synthase inhibitor herbicide manufactured and marketed by Monsanto under the brand name Roundup since 1974.

40.     In 1996, Monsanto began marketing seeds for crops that were genetically modified to be resistant to Roundup. These seeds were branded as Roundup Ready, and include soybean and cotton crops.

6

41.     The availability of Roundup Ready crops allowed farmers to apply Roundup post-emergence, to control weeds during the growing season, without fear of harming their crops.

42.     Roundup and Roundup Ready crops, including soybean and cotton, quickly dominated the seed and herbicide markets due to the effectiveness of Roundup for weed control, the flexibility of postemergence use, and the ease of using Roundup on Roundup Ready crops.

43.     By 2008, over 90% of the soybeans acres planted in the United States were Roundup Ready, and the use of glyphosate in soybeans crops had increased by 14-fold. Large increases in the use of Roundup, and the number of acres of Roundup Ready varieties planted, were seen in many other crops as well, including cotton, corn, canola, alfalfa, and sugarbeet.

44.     Widespread adoption of Roundup Ready traits across a variety of crops, and the use of large volumes of Roundup over the course of several consecutive growing seasons, created conditions in which weeds that could survive glyphosate would flourish with little competition. These weeds are commonly referred to as being Roundup or glyphosate resistant.

45.     The first Roundup resistant weed was identified in a soybean field in Delaware in 2000.

46.     In short order, multiple weeds developed Roundup-resistant mutations, including horseweed, marestail, pigweed, palmer amaranth, spiny amaranth, waterhemp, ragweeds, kochia, ryegrass, Lamb's Quarters, bluegrass, Russian-thistle, and Johnsongrass.

47.     These weeds aggressively proliferated in the absence of natural competition or other types of weed control. By 2015, over 90 million acres of American farmland were infested with Roundup resistant weeds.

48.     This posed serious challenges to farmers accustomed to planting Roundup Ready crops, who began to turn to alternative weed control systems, crops sold by Monsanto's

competitors, and use herbicides other than Roundup. According to a 2013 survey by BASF, 76% of growers had changed their weed management program due to glyphosate resistant weeds.

49.     Coinciding with the declining efficacy of Roundup was Monsanto's impending loss of patent protections for its Roundup product systems—Monsanto lost patent exclusivity for glyphosate beginning in 2000, and would lose patent exclusivity for the first generation of Roundup Ready seeds for crops, including soybeans and cotton, in 2015.

50.     Monsanto responded by signing an exclusive licensing agreement with the University of Nebraska, Lincoln to obtain the exclusive benefit of research being performed by its crop scientists on dicamba resistance. Monsanto furthered the development of dicamba tolerant crops by licensing enabling technology from Syngenta in May 2008.

51.     Monsanto intended to create new commercially available products that would be more efficacious than, and could replace, Roundup Ready products, which would soon be coming off patent and could be sold generically by Monsanto's competitors.

52.     Dicamba is extremely toxic to the broadleaf weeds that developed immunity to glyphosate; it is also extremely toxic to commercially valuable broadleaf crops such as soybean, cotton, and canola.

53.     While all dicots are sensitive to dicamba in general, certain crops including soybean, tomato, tobacco, and fruit are extraordinarily sensitive to dicamba, and can suffer severe injury at very low volumes of exposure.

54.     Depending on rates of exposure, soybean, tomato, tobacco and fruit crops can suffer major, or even total, yield losses after exposure to dicamba. Additionally, exposure can cause lingering damages that can affect seed development, reduce seed quality, and limit the vitality of a plant's progeny.

55.     Dicamba is also highly volatile, meaning that it is an herbicide that is not easily controlled and has a high likelihood of vaporizing and moving away from the area of application as a gaseous form.

56.     Dicamba can volatize days after application, travel considerable distances, and cause injuries to plants several miles away.

57.     The volatility of dicamba has been well known and studied for decades. Because of dicamba's volatility, and its extremely harmful effects on valuable non-target crops, the use of dicamba was limited to pre-planting and post-harvest burndown applications prior to 2016.

58.     A burndown application is used to clear an area of weeds and other residual pests prior to planting or after harvesting. Burndown applications are common in the early spring and late fall.

59.     Dicamba could not be, and was not, applied to planted crops after their emergence because it would damage the crops on which it was sprayed, and damage non-target crops in the vicinity after volatizing.

60.     As a result, dicamba was little used in American agriculture. From 1990-2008, dicamba accounted for between 0.5-1.6% of all herbicides applications in the U.S.

61.     Despite the very limited use of dicamba, it was still responsible for considerable amount of damage to non-target crops. In surveys of State pesticide regulators conducted from 1996-1998 and 2002-2004, dicamba was responsible for the third most reports of off-target crop injuries among all herbicides.

62.     Because dicamba was only used as a burndown herbicide, these off-target injuries were mostly sustained during cooler parts of the year.

63.     Dicamba causes injuries that are unique, distinctive, and easily distinguishable from other more common types of crop damage. Dicamba can cause cupping, curling, strapping, discoloration, leaf elongation, wrinkling, stunting, trumpeting, and twisting of exposed plants, among other symptoms.

64.     Dicamba damage is most often diagnosed visually, as the symptoms are distinctive, and chemical residue testing has limited ability to confirm or rule out the presence of dicamba after injuries have visually manifested.

65.     In January 2009, Monsanto announced that it had entered into a joint licensing agreement with BASF under which Monsanto and BASF agreed to jointly research, design, develop, test, manufacture and market formulations of dicamba that could be used on Monsanto's dicamba resistant Xtend soybeans and cotton.

66.     The companies conducted joint testing of dicamba formulations at Monsanto and BASF research locations, including but not limited to Monsanto's research facility in Monmouth, Illinois.

67.     The herbicides that would come to be known as Xtendimax, Engenia and Fexapan were results of the joint research, design and testing by Monsanto and BASF pursuant to their joint licensing agreement.

68.     Xtendimax, Engenia and Fexapan are jointly designed and manufactured by Monsanto and BASF pursuant to their licensing and supply agreements.

69.     Monsanto designs and manufactures all Xtend seeds sold by Monsanto and Dupont.

70.     Pursuant to agreement between Monsanto and BASF, Monsanto would market and sell Xtendimax for use during the 2017 growing season, while BASF would market and sell Engenia for use during the 2017 growing season.

71.     Monsanto supplied and licensed the herbicide Fexapan to Dupont under a July 2016 agreement. Pursuant to agreement between Monsanto and Dupont, Dupont would market and sell Fexapan during the 2017 growing season.

72.     In March 2013, in the midst of settling pending antitrust claims filed against it by Dupont, Monsanto also agreed to license dicamba resistant soybean seed technology to Dupont.

73.     The dicamba resistant soybean seed sold by Monsanto and Dupont, and the dicamba resistant cotton seed sold by Monsanto, would be branded, marketed, and sold as Xtend varieties.

74.     Both the United States Department of Agriculture (USDA) and Environmental Protection Agency (EPA) expressed significant concerns about the risks that may be created by the introduction of dicamba resistant crops and increased usage of dicamba.

75.     Specifically, EPA expressed concerns "related to a potential increase in usage of dicamba products and the proposed changes in the timing of applications. In general, there is a also a potential for increased susceptibility of late season plants to direct impact from off-site transport". The agency warned in March 2011 that "applications during a warmer time (i.e. post-emergence) may increase off-site transport (via volatility) during a time when many plants have leafed out…Therefore, a post-emergence application may increase the likelihood of effects to non-target plants".

76.     USDA stated that use of dicamba over a longer season "could increase exposure of dicamba-sensitive plants at growth stages later in the season", and that "the potential for undesired volatization or drift of applied dicamba onto organic crops is as of high possibility".

77.     As a result, both agencies delayed approval of the products they regulated. EPA, which regulates pesticides, delayed registration of Xtendimax and Engenia, and required multiple additional submissions before approval was reached.

78.     Similarly, USDA delayed approval of Xtend variety soybean and cotton, and required Monsanto to make multiple revisions to its petitions for determination of nonregulated status of its dicamba resistant varieties.

79.     Neither Monsanto, BASF, or Dupont provided the EPA with the results of rigorous, independent testing or analysis on the volatility of their products in real world applications, or on how dangerous their products would be to off-target crops. Monsanto expressly forbade independent testing of Xtendimax by the Arkansas Plant Board because the results might jeopardize approval by the EPA.

80.     Indeed, even upon approving these formulations for use, EPA cautioned that "Several formulations of dicamba are intended to reduce volatization of dicamba in the first few days after application, but the ability of these formulations to delay the formation of the volatile dicamba acid, under a range of environmental conditions, is not well understood".

81.     Likewise, Dr. Kevin Bradley at the University of Missouri commented that "we really can't tell you anything about the volatility or its potential volatility, because we have not been able to do that research, and that's really unfortunate".

82.     Nevertheless, Monsanto, BASF, and Dupont all advertised their new dicamba formulations as "low-volatility" herbicides that could be used safely and without fear of off-target movement.

83.     Monsanto advertised its VaporGrip technology, which is featured in both Xtendimax and Fexapan, as "A Revolutionary Breakthrough" that "provides growers and applicators confidence in on-target application of dicamba".

84.     Xtendimax was advertised as 90% less volatile than Clarity, and exponentially less volatile than Banvel.

85.    BASF informed retailers, distributors, consultants, purchasers and applicators that "the potential for dicamba volatility is low", that "the Engenia herbicide formulation was developed to further minimize secondary loss due to volatization".

86.    BASF bragged that the volatility concerns about dicamba had been addressed, "so the herbicide remains in place". Engenia was advertised as 70% less volatile than Clarity, which itself was 70% less volatile than Banvel.

87.    Dupont promised that Fexapan offered "better weed management with less worry about dicamba volatility" and touted that VaporGrip technology prevents the formation of "the volatile form of dicamba in the spray droplet" and minimizes off-target movement after spraying.

88.    These and similar statements were repeated by Defendants to customers and agricultural professionals through a variety of media, personal contacts, and sales presentations.

89.    However, the veracity of these statements was never demonstrated to regulators or independent researchers.

90.    Aaron Hager, at the University of Illinois, stated in March 2017 that "We never evaluated whether or not these formulations are, in fact, lower-volatility formulations. We have no data to demonstrate if, in fact, it's lower volatility".

91.    Further, neither Monsanto, BASF, nor Dupont ever released evidence that their formulations of dicamba would not volatize under the real-life conditions in which they were intended to be used.

92.    In fact, in the conditions in which they are intended to be used, Xtendimax, Engenia, and Fexapan, are not appreciably less volatile than older formulations of dicamba, such as Banvel or Clarity.

13

93.     In lieu of properly researching, designing, and testing their products to ensure they were safe prior to marketing them, Monsanto, BASF, and Dupont used American farmers as real-life guinea pigs during the 2017 growing season.

94.     Monsanto estimates that 20 million acres of Xtend variety soybeans, and 5 million acres of Xtend variety cotton were planted during the 2017 crop year.

95.     Monsanto, BASF, and Dupont knew their formulations of dicamba would be used on those vast acreages, and knew that non-Xtend crops within the vicinity would be placed at  risk if their dicamba products moved off target.

96.     Monsanto, BASF, and Dupont knew that their formulations of dicamba, and dicamba generally, is more likely to volatize and move off target during higher temperatures, lower humidity, or when mixed with glyphosate—precisely the conditions in which Xtendimax, Engenia, and Fexapan were intended to be used.

97.     Despite that knowledge, Monsanto, BASF, and Dupont never warned growers or applicators of the likelihood that their dicamba products would volatize and injure their neighbors' crops when used for in-crop applications.

98.     Monsanto, BASF, and Dupont knew that temperature inversions, which are common in soybean and cotton growing regions during summer months, create a high potential for off-target movement of dicamba.

99.     A temperature inversion occurs when temperatures near the soil are cooler than the air above. This phenomenon is common in the Mid-south and Midwest of the U.S. during clear summer nights.

100.    When a temperature inversion occurs, dicamba particles on or near the surface are suspended into the atmosphere and can travel for miles  in a concentrated cloud.

14

101.    While the labels for Xtendimax, Engenia, and Fexapan warn that applications should not be made during a temperature inversion, neither Monsanto, BASF, or Dupont warned growers or applicators of the likelihood that temperature inversions would cause large amounts of off target movement in dicamba applications that were madehours or days prior to the development of a temperature inversion.

102.    Instead of warning about the severe risks of off-target movement of dicamba through volatility and temperature inversion, the defendants maintained that off-target movement of their products would most likely occur from spray drift. Spray drift occurs when small droplets move to nontarget vegetation during application without ever landing on the target site.

103.    Crop damage from spray drift is easily distinguishable from damages sustained due to volatility or temperature inversions. Whereas fields affected by spray drift exhibit a pattern of more severe damage in areas closer to the application site that taper off at further distances, off-target movement through volatility and temperature inversions cause large uniform damage patterns across entire fields.

104.    While there are steps that can be taken to minimize spray drift, applicators have no way of controlling movement through volatility. Dicamba's propensity to volatize and travel great distances is a characteristic of the herbicide itself, and cannot be effectively mitigated by applicators.

105.    Likewise, besides avoiding dicamba applications during temperature inversions, applicators have no way to control movement through temperature inversions in applications made prior to the development of a temperature inversion.

106.    Further, while certain methods of application can reduce the potential for spray drift, spray drift is an inevitable result of the intended and reasonably anticipated uses of dicamba.

15

107.    The introduction of dicamba resistant crops by Monsanto and Dupont, and the sale of dicamba for post-emergence uses by Monsanto, BASF, and Dupont, led to unprecedented volumes of dicamba applications during 2017.

108.    Farmers purchased and used defendants' products reasonably and in good faith, with the expectation that the defendants' representations about Xtendimax, Engenia, and Fexapan were truthful.

109.    Farmers purchased and used Xtend variety crops, Xtendimax, Engenia, and Fexapan, with the expectation that these products could be used safely during the 2017 growing season, and would provide additional weed control options without risk of harm to non-target crops.

110.    However, Xtendimax, Engenia, and Fexapan are inherently unsafe, and cannot be used in post-emergence applications without unreasonable risk of harm to other crops.

111.    As a result of defendants' failure to properly design herbicides that were not inherently unsafe, failure to conduct rigorous testing of those herbicides, failure to warn of the risks inherent in the use of those herbicides, and deceitfulness regarding the inherent dangers of those herbicides, enormous amounts of damage have been unleashed on American agriculture.

112.    Millions of acres of American farmland have been damaged by off-target movement of dicamba and thousands of farmers' livelihoods have been placed in jeopardy.

113.    Not coincidentally, the farmers now reaping the whirlwind of the Defendants' recklessness and callous disregard are farmers who purchased products sold by the Defendants' competitors.

114.    While those who purchased Xtend variety soybeans and cotton sold by Monsanto and Dupont were immunized from damage caused by off-target movement of dicamba, farmers

who purchased competing products, including but not limited to Bayer LibertyLink varieties, generic Roundup Resistant varieties, and non-GMO varieties, were placed at enormous risk of suffering severe crop injuries and significant yield losses.

115.    Despite their shock and disgust with the defendants' conduct, many farmers who have been devastated by off target movement of defendants' dicamba products must now seriously consider purchasing and planting dicamba resistant crops from defendants' in the future, in order to protect their crops from being ruined in future growing seasons. Many others who have avoided harm this year are contemplating the same after witnessing the widespread damage caused by defendants' dicamba products.

116.    This damage and anxiety is intentional, and part of defendants' scheme to dominate farmers and monopolize the soybean and cotton seed markets, as well as the market for in-crop herbicides.

117.    Defendant Monsanto released its Xtend variety soybean and cotton in 2015, the very year that it lost patent protections for Roundup Ready soybean and cotton seed.

118.    Monsanto began marketing Xtend varieties even though no formulations of dicamba had been approved for in-crop uses, and there were few benefits to Xtend varieties other than their dicamba resistance.

119.    Monsanto understood that this would lead to off-label, over the top applications of older dicamba formulations on its Xtend products, and in fact encouraged those applications.

120.    As a result, off-label applications were made in 2015, which resulted in significant amounts of off-target dicamba damages.

121.     This in turn led to larger sales and planting of Xtend varieties in 2016, by farmers afraid of potential dicamba damage and who were assured that non-volatile formulations of dicamba would be available for the growing season.

122.     While only approximately 500,000 acres of Xtend varieties were planted in 2015, over 3 million acres were planted in 2016.

123.     Monsanto understood and reasonably anticipated that large amounts of off-label over the top applications of older dicamba formulations would occur on these acres if new formulations of dicamba were not approved for use during the 2016 growing season; indeed, it encouraged such uses.

124.     This is precisely what occurred, leading to even larger and unprecedented amounts of dicamba damages in 2016. Hundreds of thousands of acres of crops were damaged by off target dicamba that year, and exposed crops sustained major yield losses.

125.     Fear of potential damage from off-target dicamba was a major driver of sales for Xtend crops leading up to the 2017 growing season. Many farmers purchased these products after being personally damaged and suffering significant yield losses by off-target dicamba movement in prior growing seasons. Many others purchased Xtend crops because they personally knew farmers who had been damaged by off target dicamba movement, and did not want to share their fate.

126.     This fear benefitted Monsanto, who owns exclusive benefits of dicamba resistance, and its licensee Dupont, by increasing sales of Xtend products.

127.     In turn, the increased planted acreage of Xtend products benefitted BASF, and further benefitted Monsanto, and Dupont, by increasing the market for their dicamba products Xtendimax, Engenia, and Fexapan.

18

128.    As a result, 25 million acres of Xtend variety crops were planted during the 2017 growing season.

129.    While the introduction of supposedly safer dicamba products in 2017 was marketed by the Defendants as a solution to the off target dicamba damages of the 2015 and 2016 growing season, the damages from dicamba in 2017 have been exponentially worse.

130.    As of the filing of this complaint, there have been thousands of complaints of dicamba damage across dozens of States, and millions of acres of American crops have been devastated.

131.    This would not be possible if Xtendimax, Engenia, or Fexapan were safer than previous versions of dicamba in any appreciable way. Instead, Defendants sold these products knowing that harm would result from the intended and reasonably anticipated uses of their products, and that serious widespread damage would be inevitable.

132.    Perversely, it was in the Defendants' interests to do so. The more famers who are devastated by Xtendimax, Engenia, and Fexapan this year, the more farmers who will defensively buy and plant Xtend variety crops next year in order to protect themselves from being damaged by those inherently uncontrollable herbicides. This in turn increases the market for Xtendimax, Engenia, and Fexapan, as there are more planted acres upon which those herbicides can be used.

133.    This vicious and self-reinforcing cycle is a crucial aspect of the Defendants' scheme to dominate farmers and monopolize the seed and herbicide markets.

134.    In effect, the Defendants' conduct presents farmers with two alternatives: either purchase Defendants' Xtend crops or risk egregious and unreasonable harm to your crops and livelihood.

135.    The Defendants' shocking and oppressive strategy of harming potential customers in order to coerce their purchasing decisions would be bad enough on its own. It is made worse by Defendants' knowledge that their products have limited and temporary usefulness.

136.    The sole purpose of Xtend crops, Xtendimax, Engenia, and Fexapan is to provide a new herbicide option to help farmers control weeds that have grown immune to Roundup and glyphosate.

137.    However, some weeds have already developed dicamba resistance, and research indicates that many of the same weeds that have grown resistant to glyphosate can, and likely will, grow resistant to dicamba within several growing seasons.

138.    As a result, even widespread adoption of Xtend crop systems will provide only temporary relief from difficult to control weed populations.

139.    Defendants' greed is such that they are willing to cause severe and widespread harm to American farmers to coerce them into paying a premium for products which will provide with few, limited, and temporary benefits.


## CASE SPECIFIC ALLEGATIONS

140.    Plaintiff Shane Greckel grows soybeans on hundreds of acres of farmland in Knox County, NE.

141.    In June and July 2017, plaintiff observed significant dicamba injuries on his crops, including, but not limited to cupping, curling, strapping, discoloration, leaf elongation, wrinkling, stunting, trumpeting, or twisting of exposed plants. The damage was observed on over 180 acres.

142.    Numerous farmers within the vicinity of plaintiff purchased and planted seed for Xtend variety soybean and cotton, and applied Xtendimax to their Xtend variety crops.

143.     These same farmers, within the vicinity of plaintiff, applied Xtendimax in the manner intended by, and reasonably anticipated by, Monsanto and BASF.

144.     Xtendimax moved off target from application sites and onto plaintiff's crops and property after applications made in the manner intended by, and reasonably anticipated by, Monsanto and BASF, due to the inherent characteristics of the Xtendimax.

145.     As a result, plaintiffs' crops were exposed to dicamba, suffered significant injuries, and sustained a loss of yield.

146.     As a further result of exposure to dicamba, plaintiff will sustain loss of seed and progeny in future growing seasons.

147.     Numerous farmers within the vicinity of plaintiff purchased and planted seed for Xtend variety soybean and cotton, and applied Engenia to their Xtend variety crops.

148.     These same farmers, within the vicinity of plaintiff, applied Engenia in the manner intended by, and reasonably anticipated by, Monsanto and BASF.

149.     Engenia moved off target from application sites and onto plaintiff's crops and property after applications made in the manner intended by, and reasonably anticipated by, Monsanto and BASF, due to the inherent characteristics of the Engenia.

150.     As a result, plaintiffs' crops were exposed to dicamba, suffered significant injuries, and sustained a loss of yield.

151.     As a further result of exposure to dicamba, plaintiff will sustain loss of seed and progeny in future growing seasons.

152.     Numerous farmers within the vicinity of plaintiff purchased and planted seed for Xtend variety soybean and cotton, and applied Fexapan to their Xtend variety crops.

153.    These same farmers, within the vicinity of plaintiff, applied Fexapan in the manner intended by, and reasonably anticipated by, Monsanto, BASF, and Dupont.

154.    Fexapan moved off target from application sites and onto plaintiff's crops and property after applications made in the manner intended by, and reasonably anticipated by, Monsanto, BASF and Dupont, due to the inherent characteristics of the Fexapan.

155.    As a result, plaintiffs' crops were exposed to dicamba, suffered significant injuries, and sustained a loss of yield.

156.    As a further result of exposure to dicamba, plaintiff will sustain loss of seed and progeny in future growing seasons.

## CLAIMS FOR RELIEF

### COUNT I
### STRICT LIABILITY—DEFECTIVE DESIGN

157.    Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

**A.  Xtendimax**

158.    At all relevant times, Monsanto and BASF jointly researched, designed, developed, tested, manufactured and/or marketed Xtendimax.

159.    Xtendimax is defective in design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose, it cannot be used safely without causing severe risk of harm to others' crops, and its foreseeable risks exceed the benefits associated with its design and formulation.

22

160.   The design of Xtendimax is defective and unsafe in that it causes severe crop injuries as a result of volatility and off target movement, including but not limited to movement through volatility, temperature inversion, and spray drift.

161.   This design defect makes Xtendimax unreasonably dangerous, yet Defendants Monsanto and BASF knowingly introduced Xtendimax into the market.

162.   Xtendimax, as manufactured by Defendants Monsanto and BASF, remained unchanged and was in the same condition at the time of the injuries herein alleged.

163.   As a direct and proximate cause of the manufacture, sale and promotion of the defectively designed Xtendimax by Monsanto and BASF, Plaintiffs sustained serious injury to their crops.

164.   The conduct of Monsanto and BASF, as described above, was reckless. Defendants Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement of Xtendimax and suppressed this knowledge from the general public. Defendants Monsanto and BASF made conscious decisions not to redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

**B. Engenia**

165.   At all relevant times, Monsanto and BASF jointly researched, designed, developed, tested, manufactured and/or marketed Engenia.

166.   Engenia is defective in design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose, it cannot be used safely without causing severe risk of harm to others' crops, and its foreseeable risks exceed the benefits associated with its design and formulation.

167.    The design of Engenia is defective and unsafe in that it causes severe crop injuries as a result of volatility and off target movement, including but not limited to movement through volatility, temperature inversion, and spray drift.

168.    This design defect makes Engenia unreasonably dangerous, yet Defendants Monsanto and BASF knowingly introduced Engenia into the market.

169.    Engenia, as manufactured by Defendants Monsanto and BASF, remained unchanged and was in the same condition at the time of the injuries herein alleged.

170.    As a direct and proximate cause of the manufacture, sale and promotion of the defectively designed Engenia by Monsanto and BASF, Plaintiffs sustained serious injury to their crops.

171.    The conduct of Monsanto and BASF, as described above, was reckless. Defendants Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement of Engenia and suppressed this knowledge from the general public. Defendants Monsanto and BASF made conscious decisions not to redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

## C. Fexapan

172.    At all relevant times, Monsanto, BASF and Dupont jointly researched, designed, developed, tested, manufactured and/or marketed Fexapan.

173.    Fexapan is defective in design or formulation in that it is not reasonably fit, suitable, or safe for its intended purpose, it cannot be used safely without causing severe risk of harm to others' crops, and its foreseeable risks exceed the benefits associated with its design and formulation.

174.    The design of Fexapan is defective and unsafe in that it causes severe crop injuries as a result of volatility and off target movement, including but not limited to movement through volatility, temperature inversion, and spray drift.

175.    This design defect makes Fexapan unreasonably dangerous, yet Defendants Monsanto, BASF and Dupont knowingly introduced Fexapan into the market.

176.    Fexapan, as manufactured by Defendants Monsanto, BASF and Dupont, remained unchanged and was in the same condition at the time of the injuries herein alleged.

177.    As a direct and proximate cause of the manufacture, sale and promotion of the defectively designed Fexapan by Monsanto, BASF and Dupont, Plaintiffs sustained serious injury to their crops.

178.    The conduct of Monsanto, BASF and Dupont, as described above, was reckless. Defendants Monsanto, BASF and Dupont risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement of Fexpan and suppressed this knowledge from the general public. Defendants Monsanto, BASF and Dupont made conscious decisions not to redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

179.    By reason of the foregoing, Defendants are liable to Plaintiffs for compensatory and punitive damages, in amounts to be proven at trial, together with interests, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT II**
**STRICT LIABILITY—FAILURE TO WARN**

180.    Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

**A.  Xtendimax**

181.   Defendants Monsanto and BASF researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the dicamba herbicide Xtendimax; in the course of the same, Monsanto and BASF directly advertised or marketed Xtendimax to the EPA, agricultural professionals, and consumers and therefore had a duty to warn of the risks associated with Xtendimax.

182.   Xtendimax was defective due to inadequate warnings or instructions because Defendants Monsanto and BASF knew or should have known that the products created significant risks of harm to non-Xtend crops, and they failed to adequately warn consumers, regulators, and innocent bystanders of such risks.

183.   Monsanto and BASF failed to adequately warn consumers, regulators, and innocent bystanders that Xtendimax could cause severe crop injuries through volatility, temperature inversions, and spray drift.

184.   Monsanto and BASF failed to adequately warn consumers, regulators, and innocent bystanders that Xtendimax would volatize in high heat, low humidity, or when mixed with glyphosate.

185.   Monsanto and BASF failed to adequately warn consumers, regulators, and innocent bystanders that Xtendimax would move off target through temperature inversions hours and days after application.

186.   Xtendimax was defective due to inadequate post-marketing warnings or instructions because, even though Defendants Monsanto and BASF knew or should have known of the risk of severe crop injuries from the use of their products, Defendants Monsanto and BASF

failed to provide an adequate warning to consumers or innocent bystanders, knowing Xtendimax could cause serious injury.

187.   Defendants Monsanto and BASF failed to perform or otherwise facilitate adequate testing of Xtendimax; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

188.   As a direct and proximate result of the reasonably anticipated use of Xtendimax, as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants Monsanto and BASF, Plaintiffs suffered serious crop injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

189.   Defendants' conduct, as described above, was reckless. Defendants Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement of Xtendimax and suppressed this knowledge from the general public. Defendants Monsanto and BASF made conscious decisions not to redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

**B.  Engenia**

190.   Defendants Monsanto and BASF researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the dicamba herbicide Engenia; in the course of the same, Monsanto and BASF directly advertised or marketed Engenia to the EPA, agricultural professionals, and consumers and therefore had a duty to warn of the risks associated with Engenia.

27

191.    Engenia was defective due to inadequate warnings or instructions because Defendants Monsanto and BASF knew or should have known that the products created significant risks of harm to non-Xtend crops, and they failed to adequately warn consumers, regulators, and innocent bystanders of such risks.

192.    Monsanto and BASF failed to adequately warn consumers, regulators, and innocent bystanders that Engenia could cause severe crop injuries through volatility, temperature inversions, and spray drift.

193.    Monsanto and BASF failed to adequately warn consumers, regulators, and innocent bystanders that Engenia would volatize in high heat, low humidity, or when mixed with glyphosate.

194.    Monsanto and BASF failed to adequately warn consumers, regulators, and innocent bystanders that Engenia would move off target through temperature inversions hours and days after application.

195.    Engenia was defective due to inadequate post-marketing warnings or instructions because, even though Defendants Monsanto and BASF knew or should have known of the risk of severe crop injuries from the use of their products, Defendants Monsanto and BASF failed to provide an adequate warning to consumers or innocent bystanders, knowing Engenia could cause serious injury.

196.    Defendants Monsanto and BASF failed to perform or otherwise facilitate adequate testing of Engenia; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

197.    As a direct and proximate result of the reasonably anticipated use of Engenia, as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce

by Defendants Monsanto and BASF, Plaintiffs suffered serious crop injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

198.    Defendants' conduct, as described above, was reckless. Defendants Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement of Engenia and suppressed this knowledge from the general public. Defendants Monsanto and BASF made conscious decisions not to redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

**C.  Fexapan**

199.    Defendants Monsanto, BASF and Dupont researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the dicamba herbicide Fexapan; in the course of the same, Monsanto, BASF and Dupont directly advertised or marketed Fexapan to the EPA, agricultural professionals, and consumers and therefore had a duty to warn of the risks associated with Fexapan.

200.    Fexapan was defective due to inadequate warnings or instructions because Defendants Monsanto, BASF and Dupont knew or should have known that the products created significant risks of harm to non-Xtend crops, and they failed to adequately warn consumers, regulators, and innocent bystanders of such risks.

201.    Monsanto, BASF and Dupont failed to adequately warn consumers, regulators, and innocent bystanders that Fexapan could cause severe crop injuries through volatility, temperature inversions, and spray drift.

202.    Monsanto, BASF and Dupont failed to adequately warn consumers, regulators, and innocent bystanders that Fexapan would volatize in high heat, low humidity, or when mixed with glyphosate.

203.    Monsanto, BASF and Dupont failed to adequately warn consumers, regulators, and innocent bystanders that Fexapan would move off target through temperature inversions hours and days after application.

204.    Fexapan was defective due to inadequate post-marketing warnings or instructions because, even though Defendants Monsanto, BASF and Dupont knew or should have known of the risk of severe crop injuries from the use of their products, Defendants Monsanto, BASF and Dupont failed to provide an adequate warning to consumers or innocent bystanders, knowing Fexapan could cause serious injury.

205.    Defendants Monsanto, BASF and Dupont failed to perform or otherwise facilitate adequate testing of Fexapan; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

206.    As a direct and proximate result of the reasonably anticipated use of Fexapan, as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants Monsanto, BASF and Dupont, Plaintiffs suffered serious crop injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

207.    Defendants' conduct, as described above, was reckless. Defendants Monsanto, BASF and Dupont risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement of Fexapan and suppressed this knowledge from the general public. Defendants Monsanto, BASF and Dupont made conscious decisions not to

30

redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

208.   By reason of the foregoing, Defendants are liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT III
## NEGLIGENCE

209.   Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

**A.  Xtendimax**

210.   At all relevant times, Monsanto and BASF jointly researched, designed, developed, tested, manufactured and/or marketed Xtendimax.

211.   At all relevant times, Defendants Monsanto and BASF had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, and adequately warn of the risks and dangers of Xtendimax.

212.   Defendants Monsanto and BASF had a duty to exercise reasonable care in the advertising and sale of Xtendimax, including a duty to warn consumers, agricultural professionals, and innocent bystanders of the dangers associated with dicamba products that were known or should have been known to Defendants at time of the sale of Xtendimax.

213.   At all times material hereto, Defendants Monsanto and BASF had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers of Xtendimax, and the likelihood that it would cause serious crop injury through volatility, temperature inversion, and spray drift.

31

214.    Defendants Monsanto and BASF had a duty of care when they educated and informed consumers and agricultural professionals about Xtendimax and Xtend crop systems and provided information to consumers and agricultural professionals about supposedly "low volatility" dicamba formulations.

215.    Defendants had a duty to disclose to consumers and agricultural professionals the likelihood of crop injuries through the off-target movement of Xtendimax.

216.    At all times herein mentioned, Defendants Monsanto and BASF breached their duty of care by negligently and carelessly manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling Xtendimax, and failing to adequately test and warn of the risks and dangers of Xtendimax as described herein.

217.    Despite the fact that Monsanto and BASF knew or should have known that Xtendimax caused unreasonable, dangerous off target crop injuries, Monsanto and BASF continued to market Xtendimax when there were safer alternative weed control methods.

218.    At all times material hereto, Monsanto and BASF misbranded Xtendimax on an ongoing and continuous basis, and failed to warn agricultural professionals, consumers, and innocent bystanders that Xtendimax was not in fact "low volatility".

219.    Monsanto and BASF failed to disclose to regulators, agricultural professions, consumers, and innocent bystanders the known risks of off-target movement.

220.    As marketed and promoted to agricultural professions, consumers, and innocent bystanders, Monsanto and BASF failed to warn that Xtendimax caused off target crop injuries through volatility, temperature inversion, and spray drift.

221.    Monsanto and BASF knew or should have known that innocent bystanders such as Plaintiffs would foreseeably suffer injuries as a result of Defendants' failure to exercise ordinary care as described above.

222.    Although Monsanto marketed and sold Xtendimax through agreements with BASF, BASF's failure to act, and alert consumers, regulators and the general public, that Xtendimax was a volatile herbicide, despite knowing the properties and characteristics of Xtendimax, was unreasonable and intentional.

223.    Defendants' negligence was a proximate cause of the Plaintiffs' injuries, harm and economic losses which Plaintiffs suffered, and will continue to suffer, as described and prayed for herein.

224.    The conduct of Monsanto and BASF, as described above, was reckless. Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public of the dangers of Xtendimax. Defendants' reckless conduct warrants an award of punitive damages.

225.    Further, the conduct of Monsanto and BASF was willful and wanton, and demonstrates a conscious disregard for the rights of Plaintiffs, and American farmers in general. Monsanto and BASF placed Xtendimax into the stream of commerce, knowing full-well that its use would cause widespread damage to farmers who purchased different products. Monsanto and BASF understood that by causing widespread damage, they could induce additional purchases of Xtend crops by farmers seeking to protect themselves from off-target movement, which in turn

33

would increase the market for the Xtendimax herbicide. Defendants' willful and wanton conduct warrants an award for punitive damages.

**B.  Engenia**

226.    At all relevant times, Monsanto and BASF jointly researched, designed, developed, tested, manufactured and/or marketed Engenia.

227.    At all relevant times, Monsanto and BASF had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, and adequately warn of the risks and dangers of Engenia.

228.    Monsanto and BASF had a duty to exercise reasonable care in the advertising and sale of Engenia, including a duty to warn consumers, agricultural professionals, and innocent bystanders of the dangers associated with dicamba products that were known or should have been known to Defendants at time of the sale of Engenia.

229.    At all times material hereto, Defendants Monsanto and BASF had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers of Engenia, and the likelihood that it would cause serious crop injury through volatility, temperature inversion, and spray drift.

230.    Defendants Monsanto and BASF had a duty of care when they educated and informed consumers and agricultural professionals about Engenia and Xtend crop systems and provided information to consumers and agricultural professionals about supposedly "low volatility" dicamba formulations.

231.    Defendants had a duty to disclose to consumers and agricultural professionals the likelihood of crop injuries through the off-target movement of Engenia.

34

232.    At all times herein mentioned, Defendants Monsanto and BASF breached their duty of care by negligently and carelessly manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling Engenia, and failing to adequately test and warn of the risks and dangers of Engenia as described herein.

233.    Despite the fact that Monsanto and BASF knew or should have known that Engenia caused unreasonable, dangerous off target crop injuries, Monsanto and BASF continued to market Engenia when there were safer alternative weed control methods.

234.    At all times material hereto, Monsanto and BASF misbranded Engenia on an ongoing and continuous basis, and failed to warn agricultural professionals, consumers, and innocent bystanders that Engenia was not in fact "low volatility".

235.    Monsanto and BASF failed to disclose to regulators, agricultural professions, consumers, and innocent bystanders the known risks of off-target movement.

236.    As marketed and promoted to agricultural professions, consumers, and innocent bystanders, Monsanto and BASF failed to warn that Engenia caused off target crop injuries through volatility, temperature inversion, and spray drift.

237.    Monsanto and BASF knew or should have known that innocent bystanders such as Plaintiffs would foreseeably suffer injuries as a result of Defendants' failure to exercise ordinary care as described above.

238.    Although BASF sold and marketed Engenia, through agreements with Monsanto, Monsanto's failure to act, and alert consumers, regulators and the general public, that Engenia was a volatile herbicide, despite knowing the properties and characteristics of Engenia, was unreasonable and intentional.

35

239.   Defendants' negligence was a proximate cause of the Plaintiffs' injuries, harm and economic losses which Plaintiffs suffered, and will continue to suffer, as described and prayed for herein.

240.   The conduct of Monsanto and BASF, as described above, was reckless. Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public of the dangers of Engenia. Defendants' reckless conduct warrants an award of punitive damages.

241.   Further, the conduct of Monsanto and BASF was willful and wanton, and demonstrates a conscious disregard for the rights of Plaintiffs, and American farmers in general. Monsanto and BASF placed Engenia into the stream of commerce, knowing full-well that its use would cause widespread damage to farmers who purchased different products. Monsanto and BASF understood that by causing widespread damage, they could induce additional purchases of Xtend crops by farmers seeking to protect themselves from off-target movement, which in turn would increase the market for the Engenia herbicide. Defendants' willful and wanton conduct warrants an award of punitive damages.

### C. Fexapan

242.   At all relevant times, Monsanto, BASF and Dupont jointly researched, designed, developed, tested, manufactured and/or marketed Engenia.

243.   At all relevant times, Monsanto, BASF and Dupont had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research,

distribute, market, label, package, distribute, prepare for use, sell, and adequately warn of the risks and dangers of Fexapan.

244.   Monsanto, BASF and Dupont had a duty to exercise reasonable care in the advertising and sale of Fexapan, including a duty to warn consumers, agricultural professionals, and innocent bystanders of the dangers associated with dicamba products that were known or should have been known to Defendants at time of the sale of Fexapan.

245.   At all times material hereto, Defendants Monsanto, BASF and Dupont had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers of Fexapan, and the likelihood that it would cause serious crop injury through volatility, temperature inversion, and spray drift.

246.   Defendants Monsanto, BASF and Fexapan had a duty of care when they educated and informed consumers and agricultural professionals about Fexapan and Xtend crop systems and provided information to consumers and agricultural professionals about supposedly "low volatility" dicamba formulations.

247.   Defendants had a duty to disclose to consumers and agricultural professionals the likelihood of crop injuries through the off-target movement of Fexapan.

248.   At all times herein mentioned, Defendants Monsanto, BASF and Dupont breached their duty of care by negligently and carelessly manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling Fexapan, and failing to adequately test and warn of the risks and dangers of Fexapan as described herein.

249.     Despite the fact that Monsanto, BASF and Dupont knew or should have known that Fexapan caused unreasonable, dangerous off target crop injuries, Monsanto, BASF and Dupont continued to market Fexapan when there were safer alternative weed control methods.

250.     At all times material hereto, Monsanto, BASF and Dupont misbranded Fexapan on an ongoing and continuous basis, and failed to warn agricultural professionals, consumers, and innocent bystanders that Fexapan was not in fact "low volatility".

251.     Monsanto, BASF and Fexapan failed to disclose to regulators, agricultural professions, consumers, and innocent bystanders the known risks of off-target movement.

252.     As marketed and promoted to agricultural professions, consumers, and innocent bystanders, Monsanto, BASF and Dupont failed to warn that Fexapan caused off target crop injuries through volatility, temperature inversion, and spray drift.

253.     Monsanto, BASF and Dupont knew or should have known that innocent bystanders such as Plaintiffs would foreseeably suffer injuries as a result of Defendants' failure to exercise ordinary care as described above.

254.     Although Dupont sold Fexapan, through agreements with Monsanto, Monsanto and BASF's failure to act, and alert consumers, regulators and the general public, that Fexapan was a volatile herbicide, despite knowing the properties and characteristics of Fexapan, was unreasonable and intentional.

255.     Defendants' negligence was a proximate cause of the Plaintiffs' injuries, harm and economic losses which Plaintiffs suffered, and will continue to suffer, as described and prayed for herein.

256.     The conduct of Monsanto, BASF and Dupont as described above, was reckless. Monsanto, BASF and Dupont risk the livelihoods of American farmers, including Plaintiffs, with

knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public of the dangers of Fexapan. Defendants' reckless conduct warrants an award of punitive damages.

257.     Further, the conduct of Monsanto, BASF and Dupont was willful and wanton, and demonstrates a conscious disregard for the rights of Plaintiffs, and American farmers in general. Monsanto, BASF and Dupont placed Fexapan into the stream of commerce, knowing full-well that its use would cause widespread damage to farmers who purchased different products. Monsanto, BASF and Dupont understood that by causing widespread damage, they could induce additional purchases of Xtend crops by farmers seeking to protect themselves from off-target movement, which in turn would increase the market for the Fexapan herbicide. Defendants' willful and wanton conduct warrants an award of punitive damages.

258.     By reason of the foregoing, Defendants are liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

## COUNT IV
## CONTINUING NUISANCE

259.     Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

### A. Xtendimax

260.     The post-emergence application of Xtendimax has caused a substantial and unreasonable interference with Plaintiffs' ability to use and enjoy their land as they see fit.

261.    Monsanto and BASF designed, tested, and marketed a defective herbicide, Xtendimax, that cannot be applied without causing grave risk of harm via off-target movement.

262.    The harm to Plaintiffs was the reasonably foreseeable consequence of marketing herbicides that cannot remain on-target, and would not have occurred if Monsanto and BASF properly designed and tested Xtendimax.

263.    The sale of Xtendimax set in motion a force or chain of events resulting in the invasion of Plaintifs' property.

264.    Although Monsanto sold Xtendimax through agreements with BASF, BASF's failure to act, and alert consumers, regulators and the general public, that Xtendimax was a volatile herbicide, despite knowing the properties and characteristics of Xtendimax, was unreasonable and intentional.

265.    This conduct was a substantial factor in bringing about Plaintiffs' injuries.

266.    Further, Monsanto and BASF knew that the sale of Xtendimax would cause such harm, and permitted Xtendimax to be sold anyway in order to increase sales and market share of their products.

267.    The conduct of Monsanto and BASF has created a nuisance and caused widespread damage by encouraging post-emergence applications of Xtendimax.

268.    The widespread and significant off target movement of Xtendimax constitutes an unreasonable and substantial interference that was imposed on Plaintiffs.

269.    It arises from Defendants' manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling Xtendimax, and failing to adequately warn of the risks and dangers of Xtendimax as described herein.

270.     Specifically, when Xtendimax was marketed, Monsanto and BASF knew that Xtendimax was prone to volatize, move off target through temperature inversions, and move off target through spray drift, and will do so despite all mitigation efforts available to applicators.

271.     Monsanto and BASF introduced Xtendimax into the stream of commerce, knowing, or negligently ignorant to the fact that Xtendimax is highly toxic to non-Xtend crops, and would cause severe damage to farmers who purchased and planted crops sold by Defendants' competitors.

272.     Monsanto and BASF have unreasonably interfered with the Plaintiffs' right to utilize their property and farmland how they see fit, and grow and raise crops of their choosing, free of damage and toxic interference from Xtendimax.

273.     This interference with Plaintiffs' rights was substantial, and has led to significant property damage and economic loss.

274.     Plaintiffs' damages, and interference with Plaintiffs' property rights, were the foreseeable consequence of placing the volatile herbicide Xtendimax into the stream of commerce, and failing to warn or inform consumers, applicators, and farmers of the true characteristics of Xtendimax, and its likelihood to volatize or otherwise move off-target.

275.     Monsanto and BASF reasonably anticipated, and indeed intended, that farmers and applicators would apply Xtendimax, and thereby cause harm to third parties who did not purchase Xtend crops.

276.     The conduct of Monsanto and BASF, as described above, was reckless. Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public.

Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages and injunctive relief.

**B.  Engenia**

277.    The post-emergence application of Engenia has caused a substantial and unreasonable interference with Plaintiffs' ability to use and enjoy their land as they see fit.

278.    Monsanto and BASF designed, tested, and marketed a defectice herbicide, Engenia, that cannot be applied without causing grave risk of harm via off-target movement.

279.    The harm to Plaintiffs was the reasonable forseeable consequence of marketing herbicides that cannot remain on-target, and would not have occurred if Monsanto and BASF properly designed and tested Engenia.

280.    The sale of Engenia set in motion a force or chain of events resulting in the invasion of Plaintiffs' property.

281.    Although BASF sold Engenia through agreements with Monsanto, Monsanto's failure to act, and alert consumers, regulators and the general public, that Engenia was a volatile herbicide, despite knowing the properties and characteristics of Engenia, was unreasonable and intentional.

282.    This conduct was a substantial factor in bringing about Plaintiffs' injuries.

283.    Further, Monsanto and BASF knew that the sale of Engenia would cause such harm, and permitted Engenia to be sold anyway in order to increase sales and market share of their products.

284.    The conduct of Monsanto and BASF has created a nuisance and caused widespread damage by encouraging post-emergence applications of Engenia.

42

285.     The widespread and significant off target movement of Engenia constitutes an unreasonable and substantial interference that was imposed on Plaintiffs.

286.     It arises from Defendants' manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling Engenia, and failing to adequately warn of the risks and dangers of Engenia as described herein.

287.     Specifically, when Engenia was marketed, Monsanto and BASF knew that Engenia was prone to volatize, move off target through temperature inversions, and move off target through spray drift, and will do so despite all mitigation efforts available to applicators.

288.     Monsanto and BASF introduced Engenia into the stream of commerce, knowing, or negligently ignorant to the fact that Engenia is highly toxic to non-Xtend crops, and would cause severe damage to farmers who purchased and planted crops sold by Defendants' competitors.

289.     Monsanto and BASF have unreasonably interfered with the Plaintiffs' right to utilize their property and farmland how they see fit, and grow and raise crops of their choosing, free of damage and toxic interference from Engenia.

290.     This interference with Plaintiffs' rights was substantial, and has led to significant property damage and economic loss.

291.     Plaintiffs' damages, and interference with Plaintiffs' property rights, were the foreseeable consequence of placing the volatile herbicide Engenia into the stream of commerce, and failing to warn or inform consumers, applicators, and farmers of the true characteristics of Engenia, and its likelihood to volatize or otherwise move off-target.

292.     Monsanto and BASF reasonably anticipated, and indeed intended, that farmers and applicators would apply Engenia, and thereby cause harm to third parties who did not purchase Xtend crops.

293.     The conduct of Monsanto and BASF, as described above, was reckless. Monsanto and BASF risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages and injunctive relief.

**C. Fexapan**

294.     The post-emergence application of Fexapan has caused a substantial and unreasonable interference with Plaintiff's ability to use and enjoy their land as they see fit.

295.     Monsanto, BASF and Dupont designed, tested and marketed a defective herbicide, Fexapan, that cannot be applied without causing grave risk of harm via off-target movement.

296.     The harm to Plaintiffs was the reasonably foreseeable consequence of marketing herbicides that cannot remain on-target, and would not have occurred if Monsanto, BASF and Dupont properly designed and tested Fexapan.

297.     The sale of Fexapan set in motion a force or chain of events resulting in the invasion of Plaintiffs' property.

298.     Although Dupont sold Fexapan through agreements with Monsanto, Monsanto and BASF's failure to act, and alert consumers, regulators and the general public, that Fexapan was a volatile herbicide, despite knowing the properties and characteristics of Fexapan, was unreasonable and intentional.

299.     This conduct was a substantial factor in bringing about Plaintiffs' injuries.

300.    Further, Monsanto, BASF and Dupont knew that the sale of Fexapan would cause such harm, and permitted Fexapan to be sold anyway in order to increase sales and market share of their products.

301.    The conduct of Monsanto, BASF and Dupont has created a nuisance and caused widespread damage by encouraging post-emergence applications of Fexapan.

302.    The widespread and significant off target movement of Fexapan constitutes an unreasonable and substantial interference that was imposed on Plaintiffs.

303.    It arises from Defendants' manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling Fexapan, and failing to adequately warn of the risks and dangers of Fexapan as described herein.

304.    Specifically, when Fexapan was marketed, Monsanto, BASF and Dupont knew that Fexapan was prone to volatize, move off target through temperature inversions, and move off target through spray drift, and will do so despite all mitigation efforts available to applicators.

305.    Monsanto, BASF and Dupont introduced Fexapan into the stream of commerce, knowing, or negligently ignorant to the fact that Fexapan is highly toxic to non-Xtend crops, and would cause severe damage to farmers who purchased and planted crops sold by Defendants' competitors.

306.    Monsanto, BASF and Dupont have unreasonably interfered with the Plaintiffs' right to utilize their property and farmland how they see fit, and grow and raise crops of their choosing, free of dama\ge and toxic interference from Fexapan.

307.    This interference with Plaintiffs' rights was substantial, and has led to significant property damage and economic loss.

45

308.    Plaintiffs' damages, and interference with Plaintiffs' property rights, were the foreseeable consequence of placing the volatile herbicide Fexapan into the stream of commerce, and failing to warn or inform consumers, applicators, and farmers of the true characteristics of Fexapan, and its likelihood to volatize or otherwise move off-target.

309.    Monsanto, BASF and Dupont reasonably anticipated, and indeed intended, that farmers and applicators would apply Fexapan, and thereby cause harm to third parties who did not purchase Xtend crops.

310.    The conduct of Monsanto, BASF and Dupont as described above, was reckless. Monsanto, BASF and Dupont risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages and injunctive relief.

311.    By reason of the foregoing, Defendants are liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT V**
**NEBRASKA CONSUMER PROTECTION ACT**
*(Neb. Rev. Stat. §59-1601 et seq.)*

312.    Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

**A.  Xtendimax**

313.    Defendants Monsanto and BASF engaged in unfair competition or unfair, unconscionable, and deceptive acts or practices in violation of the Nebraska Consumer Protection

46

Act when they failed to adequately warn consumers and the agricultural community of the safety risks associated with Xtendimax and the Xtend Crop System. As a direct result of Monsanto's and BASF's deceptive, unfair, and unconscionable conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

314.    The actions and failure to act by Monsanto and BASF, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of Xtendimax and the Xtend Crop System, constitute acts, uses or employment by Monsanto and BASF of unconscionable commercial practices, deception, false pretenses, misrepresentation, and the knowing and willful concealment, suppression or omission of material facts in connection with the sale of Xtendimax and the Xtend crop system in violation of the consumer protection statutes listed above.

315.    The agricultural community and farmers within the vicinity of Plaintiffs relied upon Monsanto's and BASF's misrepresentations and omissions in determining whether to purchase and use Xtend crops and Xtendimax.

316.    By reason of the unlawful acts engaged in by Monsanto and BASF, Plaintiffs have suffered ascertainable loss and damages.

317.    As a direct and proximate result of Monsanto's and BASF's conduct, Plaintiffs suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

318.    By reason of the foregoing, Monsanto and BASF are liable to Plaintiffs under the Nebraska Consumer Protection Act for compensatory, statutory and punitive damages to the extent available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

**B. Engenia**

319.    Defendants Monsanto and BASF engaged in unfair competition or unfair, unconscionable, and deceptive acts or practices in violation of the Nebraska Consumer Protection Act when they failed to adequately warn consumers and the agricultural community of the safety risks associated with Engenia and the Xtend Crop System. As a direct result of Monsanto's and BASF's deceptive, unfair, and unconscionable conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

320.    The actions and failure to act by Monsanto and BASF, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of Engenia and the Xtend Crop System, constitute acts, uses or employment by Monsanto and BASF of unconscionable commercial practices, deception, false pretenses, misrepresentation, and the knowing and willful concealment, suppression or omission of material facts in connection with the sale of Engenia and the Xtend crop system in violation of the consumer protection statutes listed above.

321.    The agricultural community and farmers within the vicinity of Plaintiffs relied upon Monsanto's and BASF's misrepresentations and omissions in determining whether to purchase and use Xtend crops and Engenia.

322.    By reason of the unlawful acts engaged in by Monsanto and BASF, Plaintiffs have suffered ascertainable loss and damages.

323.    As a direct and proximate result of Monsanto's and BASF's conduct, Plaintiffs suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

324.    By reason of the foregoing, Monsanto and BASF are liable to Plaintiffs under the Nebraska Consumer Protection Act for compensatory, statutory and punitive damages to the extent

available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

### C.  Fexapan

325.    Defendants Dupont, Monsanto, and BASF engaged in unfair competition or unfair, unconscionable, and deceptive acts or practices in violation of the Nebraska Consumer Protection Act when they failed to adequately warn consumers and the agricultural community of the safety risks associated with Fexapan and the Xtend Crop System. As a direct result of Dupont's, Monsanto's and BASF's deceptive, unfair, and unconscionable conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

326.    The actions and failure to act by Dupont, Monsanto and BASF, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of Fexapan and the Xtend Crop System, constitute acts, uses or employment by Dupont, Monsanto and BASF of unconscionable commercial practices, deception, false pretenses, misrepresentation, and the knowing and willful concealment, suppression or omission of material facts in connection with the sale of Fexapan and the Xtend crop system in violation of the consumer protection statutes listed above.

327.    The agricultural community and farmers within the vicinity of Plaintiffs relied upon Dupont's, Monsanto's and BASF's misrepresentations and omissions in determining whether to purchase and use Xtend crops and Fexapan.

328.    By reason of the unlawful acts engaged in by Dupont, Monsanto and BASF, Plaintiffs have suffered ascertainable loss and damages.

329.    As a direct and proximate result of Dupont's, Monsanto's and BASF's conduct, Plaintiffs suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

330.    By reason of the foregoing, Dupont, Monsanto and BASF are liable to Plaintiffs under the Nebraska Consumer Protection Act for compensatory, statutory and punitive damages to the extent available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

**COUNT VI**
**NEBRASKA CONSUMER PROTECTION ACT**
*(Neb. Rev. Stat. §87-301 et seq.)*

331.    Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

**A.  Xtendimax**

332.    Defendants Monsanto and BASF engaged in unfair competition or unfair, unconscionable, and deceptive acts or practices in violation of the Nebraska Uniform Deceptive Trade Practices Act when they failed to adequately warn consumers and the agricultural community of the safety risks associated with Xtendimax and the Xtend Crop System. As a direct result of Monsanto's and BASF's deceptive, unfair, and unconscionable conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

333.    The actions and failure to act by Monsanto and BASF, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of Xtendimax and the Xtend Crop System, constitute acts, uses or employment by Monsanto and BASF of unconscionable commercial practices, deception, false pretenses, misrepresentation, and the knowing and willful concealment, suppression or omission of material facts in connection with

50

the sale of Xtendimax and the Xtend crop system in violation of the consumer protection statutes listed above.

334.    The agricultural community and farmers within the vicinity of Plaintiffs relied upon Monsanto's and BASF's misrepresentations and omissions in determining whether to purchase and use Xtend crops and Xtendimax.

335.    By reason of the unlawful acts engaged in by Monsanto and BASF, Plaintiffs have suffered ascertainable loss and damages.

336.    As a direct and proximate result of Monsanto's and BASF's conduct, Plaintiffs suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

337.    By reason of the foregoing, Monsanto and BASF are liable to Plaintiffs under the Nebraska Uniform Deceptive Trade Practices Act for compensatory, statutory and punitive damages to the extent available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

**B. Engenia**

338.    Defendants Monsanto and BASF engaged in unfair competition or unfair, unconscionable, and deceptive acts or practices in violation of the Nebraska Uniform Deceptive Trade Practices Act when they failed to adequately warn consumers and the agricultural community of the safety risks associated with Engenia and the Xtend Crop System. As a direct result of Monsanto's and BASF's deceptive, unfair, and unconscionable conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

339.    The actions and failure to act by Monsanto and BASF, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of Engenia and the Xtend Crop System, constitute acts, uses or employment by Monsanto and

51

BASF of unconscionable commercial practices, deception, false pretenses, misrepresentation, and the knowing and willful concealment, suppression or omission of material facts in connection with the sale of Engenia and the Xtend crop system in violation of the consumer protection statutes listed above.

340.    The agricultural community and farmers within the vicinity of Plaintiffs relied upon Monsanto's and BASF's misrepresentations and omissions in determining whether to purchase and use Xtend crops and Engenia.

341.    By reason of the unlawful acts engaged in by Monsanto and BASF, Plaintiffs have suffered ascertainable loss and damages.

342.    As a direct and proximate result of Monsanto's and BASF's conduct, Plaintiffs suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

343.    By reason of the foregoing, Monsanto and BASF are liable to Plaintiffs under the Nebraska Uniform Deceptive Trade Practices Act for compensatory, statutory and punitive damages to the extent available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

**C. Fexapan**

344.    Defendants Dupont, Monsanto, and BASF engaged in unfair competition or unfair, unconscionable, and deceptive acts or practices in violation of the Nebraska Uniform Deceptive Trade Practices Act when they failed to adequately warn consumers and the agricultural community of the safety risks associated with Fexapan and the Xtend Crop System. As a direct result of Dupont's, Monsanto's and BASF's deceptive, unfair, and unconscionable conduct, Plaintiff suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

345.    The actions and failure to act by Dupont, Monsanto and BASF, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of Fexapan and the Xtend Crop System, constitute acts, uses or employment by Dupont, Monsanto and BASF of unconscionable commercial practices, deception, false pretenses, misrepresentation, and the knowing and willful concealment, suppression or omission of material facts in connection with the sale of Fexapan and the Xtend crop system in violation of the consumer protection statutes listed above.

346.    The agricultural community and farmers within the vicinity of Plaintiffs relied upon Dupont's, Monsanto's and BASF's misrepresentations and omissions in determining whether to purchase and use Xtend crops and Fexapan.

347.    By reason of the unlawful acts engaged in by Dupont, Monsanto and BASF, Plaintiffs have suffered ascertainable loss and damages.

348.    As a direct and proximate result of Dupont's, Monsanto's and BASF's conduct, Plaintiffs suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

349.    By reason of the foregoing, Dupont, Monsanto and BASF are liable to Plaintiffs under the Nebraska Uniform Deceptive Trade Practices Act for compensatory, statutory and punitive damages to the extent available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the court deems proper.

## COUNT VII
## CIVIL CONSPIRACY

350.    Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

351.    Monsanto and BASF entered into agreements whereby they would jointly research, design, develop, test, manufacture and market formulations of dicamba that could be used on Monsanto's dicamba resistant Xtend soybeans and cotton.

352.    In the course of desigining, developing, testing and manufacturing Xtendimax and Engenia, it was apparent to Monsanto and BASF that Xtendimax and Engenia were volatile herbicides that would pose severe risks to non-Xtend crops. Further,

353.    Monsanto and BASF agreed to market Xtendimax and Engenia anyway, and to suppress the facts regarding the volatility of Xtendimax and Engenia in order to increase sales of Xtend crops and thereby increase the market for Xtendimax and Engenia.

354.    Through the course of this conspiracy, Monsanto and BASF marketed Xtendimax and Engenia as low-volatility herbicides, as described above, despite knowing that Xtendimax and Engenia are not in fact low volatility herbicides, and were likely to cause widespread injury to non-target vegetation.

355.    When Monsanto agreed to license its dicamba herbicide and Xtend crops to Dupont for sale, Dupont entered into agreements with Monsanto and Dupont to similarly suppress the facts regarding the volatility of Xtendimax, Engenia and Fexapan, in order to increase sales of Xtend crops and thereby increase the market for Fexapan, Xtendimax, and Engenia.

356.    Despite decades of experience with dicamba's volatility, and major concerns expressed by regulatory agencies, Defendants still refuse to acknowledge that Xtendimax, Engenia, or Fexapan are moving off target through volatility.

357.    Likewise, Defendants have not levied a single criticism about each others' dicamba formulations, but instead have banded together to defend against claims that any of their products are defective.

358.    Through this conspiracy, Defendants knowingly created a scenario in which post-emergence application of dicamba products would cause off-target movement and damage crops sold by their competitors, including Plaintiffs' crops, in order to fuel further sales of Xtend crops, Xtendimax, Engenia, and Fexapan.

359.    The object of the unlawful conspiracy was the sale of Xtend crops, Xtendimax, Engenia, and Fexapan and the destruction of competing brands of soybeans, cotton, and primary weed control agents.

360.    In furtherance of this conspiracy, Defendants unlawfully risk the livelihoods of American farmers, including Plaintiffs, with knowledge that farmers would suffer extensive damage if they refused to purchase Defendants' products.

361.    As a result of the Defendants' conspiracy to suppress the facts regarding the volatility of Xtendimax, Engenia, and Fexapan, and to deceive farmers and the agricultural community that those products could be used safely without harm of off-target crop damage, farmers within the vicinity of the Plaintiffs purchased Xtend crops and applied Xtendimax, Engenia, and Fexapan in the manner intended by, or reasonably anticipated by the Defendants.

362.    As a direct and proximate result of this conspiracy, Plaintiffs thereby suffered injuries and damages as alleged herein.

363.    By reason of the foregoing, Defendants are liable for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

### COUNT VII
### PUNITIVE DAMAGES

364.    Plaintiffs incorporate by reference each and every paragraph set forth above as if fully set forth herein.

365.   The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the livelihood of American farmers, including Plaintiffs, for the primary purpose of increasing Defendants' profits from the sale and distribution of Xtend crops, Xtendimax, Engenia, and Fexapan, and the secondary purpose of dominating American farmers and dictating their purchasing decisions. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

366.   Prior to the manufacturing, sale, and distribution of Xtendimax, Engenia, and Fexapan, Defendants knew that these products were in a defective condition as previously described herein and knew that those who did not plant Xtend crops would experience and did experience severe crop injuries, and significant anxiety resulting from the potential loss of their livelihood. Further, Defendants, through their officers, directors, managers, and agents, knew that these herbicides presented a substantial and unreasonable risk of harm to the public, including Plaintiffs, and as such, Defendants unreasonably subjected innocent bystanders to harm by introducing these herbicides into the stream of commerce.

367.   Despite their knowledge, Defendants, acting through their officers, directors, and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Xtendimax, Engenia, and Fexapan, and failed to warn the public, including Plaintiffs, of the extreme risk of injury occasioned by said defects inherent in these herbicides. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of these herbicides knowing these actions

56

would expose farmers to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

368.    Defendants' conduct was despicable and so contemptible that they would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiffs, entitling Plaintiffs to exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for relief and judgment against each of the Defendants, as appropriate to each cause of action alleged, as follows:

A.  Entry of preliminary and permanent injunctions providing that Monsanto and Dupont shall be enjoined from selling, marketing, distributing, or otherwise disseminating Xtend crops;

B.  Entry of preliminary and permanent injunctions providing that Monsanto, BASF, and Dupont shall be enjoined from selling, marketing, distributing, or otherwise disseminating Xtendimax, Engenia, and Fexapan;

C.  Monetary damages including compensatory relief to which Plaintiffs are entitled according to proof at the time of trial;

D.  Punitive and exemplary damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

E.  Statutory damages in an amount within the jurisdiction of this Court and according to proof at the time of trial;

F.  Restitution, disgorgement of profits, and other equitable relief;

G.  Attorneys' fees;

H.  For costs of suit incurred herein;

I.  For pre-judgment interest as provided by law; and

J.   For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand trial by jury of all claims so triable.

Respectfully submitted by,


    /s/Rod Rehm                                     


Rod Rehm
REHM, BENNETT, MOORE,
REHM & OCKANDER, P.C., L.L.O.
3701 Union Dr., #200
Lincoln, NE 68516
(402) 420-1400
(402) 420-1508
rodrehm@rehmlaw.com
NE Bar #13468

        and

René F. Rocha III
MORGAN & MORGAN—COMPLEX
LITIGATION GROUP
909 Poydras Street
Suite 1625
New Orleans, LA 70112
T:  (305) 989-8688
F:  (954) 327-3018
rrocha@forthepeople.com
LA Bar #34411
*(pro hac vice pending)*

***Attorneys for Plaintiffs***


Dated: July 10, 2018